IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

TRACEY H.,[1]                    )
      Plaintiff,               )         Civil Action No. 4:20-cv-00040
                )
v.                               )         REPORT & RECOMMENDATION
                )
KILOLO KIJAKAZI,                 )         By:    Joel C. Hoppe
Acting Commissioner of Social Security,   )         United States Magistrate Judge
      Defendant.[2]             )

      Plaintiff Tracey H. asks this Court to review the Commissioner of Social Security's final

decision denying her application for disability insurance benefits ("DIB") under Title II of the

Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral under

28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and

the applicable law, I find that the Commissioner's decision is supported by substantial evidence.

Accordingly, I respectfully recommend that the presiding District Judge affirm the decision.

I. Standard of Review

      The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Kilolo Kijakazi became Acting Commissioner of Social Security in July 2021. Acting Commissioner
Kijakazi is hereby substituted for the former Commissioner, Andrew M. Saul, as the named defendant in
this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets

or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant

work based on his or her residual functional capacity; and, if not (5) whether he or she can

perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*,

858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of

proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to

prove that the claimant is not disabled. *See id.*

## II. Procedural History

Tracey applied for DIB in July 2017. Administrative Record ("R.") 169–70, ECF No. 15.

She alleged disability as of April 23, 2016, based on the following impairments: chronic low

blood pressure; right leg radiculopathy; myofascial lumbar strain; L3-L4 mild foraminal

narrowing from facet arthropathy; hypertrophy; high blood pressure; high cholesterol; and low

thyroid. R. 185. She was forty-five years old, or a "younger person" under the regulations, when

she allegedly became disabled. R. 87; 20 C.F.R. § 404.1563(c). Her application was denied in

September 2017, R. 87–98, and upon reconsideration in March 2018, R. 99–110. In June 2019,

Tracey appeared with a non-attorney representative at an administrative hearing before ALJ

Anthony J. Johnson, Jr. R. 52–86. A vocational expert ("VE") also testified at this hearing. R.

76–85.

ALJ Johnson issued an unfavorable decision on July 11, 2019. R. 11–23. He first found

that Tracey had "not engaged in substantial gainful activity since April 23, 2016, the alleged

onset date." R. 13. Tracey's degenerative disc disease of the lumbar spine and obesity were

"severe" impairments. *Id.* The ALJ determined that her other alleged impairments—including

high blood pressure, high cholesterol, sinus tachycardia, and chronic venous insufficiency—were

non-severe. R. 14. Tracey's severe impairments did not meet or medically equal the Listing for

disabling disorders of the spine. R. 14–15 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04).

ALJ Johnson then evaluated Tracey's residual functional capacity ("RFC") and found

that she could do "light work"[4] with additional limitations. R. 15. Tracey could lift, carry, push,

and pull twenty pounds occasionally and ten pounds frequently; could stand and/or walk for six

hours, and sit for more than six hours, in a normal eight-hour workday; could occasionally climb

ramps and stairs; could occasionally balance, stoop, kneel, crouch, and crawl; could occasionally

"tolerate exposure to vibration and workplace hazards such as unprotected heights [and] moving

machinery," but could never climb ropes, ladders, or scaffolds. R. 15. She also "must be

permitted to alter position[s] between sitting and standing at intervals of approximately 30

minutes while remaining on task." *Id.* (spelling corrected). Based on this RFC finding and the

VE's testimony, ALJ Johnson found that Tracey was unable to perform any past relevant work,

but that she could perform other "light" unskilled jobs (information clerk, assembler, hand

packager) existing in significant numbers in the national economy. R. 21–22; *see* R. 77–79.

Thus, ALJ Johnson concluded that Tracey was not disabled after April 23, 2016. *See* R. 22–23.

The Appeals Council denied Tracey's request to review that decision in May 2020, R. 1–3, and

this appeal followed.

### III. Discussion

Tracey raises several arguments challenging ALJ Johnson's decision.  *See generally* Pl.'s

Br. 2–8, ECF No. 18. First, she argues that he did not adequately consider the evidence relating

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

to her severe impairment of degenerative disc disease. *Id.* at 2–5. She then asserts that he erroneously discounted the severity of her alleged symptoms and that his RFC determination is not supported by substantial evidence. *Id.* at 6–7 ¶ VII. Tracey also contends that ALJ Johnson did not consider many of her impairments, and she contends that he improperly found several conditions were non-severe. *Id.* Lastly, she argues that the evidence in her case was not evaluated "fairly, impartially or objectively." *Id.* at 6 ¶ 6.

Tracey's objections are not persuasive. To start, the question in this case is not whether Tracey is disabled, or even whether ALJ Johnson should have found her to be disabled. *See, e.g.*, Pl.'s Br. 1 ("Plaintiff argues that there is substantial evidence that supports a finding that the Plaintiff is disable[d] and should be awarded social security disability benefits[.]"). Rather, the question is whether ALJ Johnson's conclusion that Tracey was "*not* disabled is supported by substantial evidence and reached based upon a correct application of the relevant law." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (emphasis added). This means the Court's only role is to ensure that the ALJ "applied [the] correct legal standards and [his] factual findings are supported by substantial evidence" in the record. *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015) (noting that "a reviewing court must uphold the [Commissioner's] determination when" the ALJ's decision meets both criteria). "There were a number of conflicts in the evidence here," and I cannot "second guess the ALJ in resolving those conflicts" so long as he considered all relevant evidence and applied the correct legal standards. *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018). ALJ Johnson's decision satisfies this "deferential" standard of review, *Jarvis v. Berryhill*, 697 F. App'x 251, 251 (4th Cir. 2017), for the reasons explained below.

A.    *Summary*

    1.    *Relevant Medical Evidence*

5

Tracey began experiencing back pain after a workplace injury in April 2016. *See* R. 323. On April 22, 2016, she visited the emergency room complaining of lower back pain. R. 322. On exam, she displayed mild back pain in the lumbar area and a painful range of motion, but she had 5/5 strength in all extremities and a steady gait. R. 323. She "showed no signs or symptoms of cord compression or radiculopathy," was advised not to lift more than fifteen pounds for one week, was diagnosed with a muscle strain, and was discharged in stable condition. R. 323–24. An MRI of Tracey's lumbar spine taken a few days later showed degenerative disc disease and facet arthropathy, but her vertebral bodies were "in relative[ly] normal alignment." R. 276. Another MRI, performed on May 23, demonstrated "[d]isc space narrowing with small broad-based disc bulge," "mild foraminal narrowing from facet arthropathy and hypertrophy" at L3-L4, "[m]oderate broad-based disc protrusion which extends into the foramina bilaterally," and "moderate facet arthropathy and hypertrophy with fluid in the facet joints" at L4-L5. R. 284.

On June 24, Tracey saw Leon J. Abram, M.D., for continued lower back and right leg pain. R. 336–37. She was still "out of work secondary to [the] severity of her back pain." R. 336. Dr. Abram noted that an "MRI of the thoracic spine [was] essentially normal," but that an "MRI of the lumbar spine completed recently show[ed] evidence of central herniated disc at L4-L5, with significant and fairly severe central spinal stenosis, [and] lateral recess stenosis." R. 337. He also noted that X-rays of the lumbar spine showed "a near grade 1 spondylolisthesis during flexion but near normal alignment in extension." *Id.* On exam, Tracey was "minimally tender at the lumbosacral junction" and her range of motion was near full flexion, but she lacked some extension. *Id.* She had 5/5 strength in her lower extremities, negative straight leg raising tests bilaterally, a "[n]ormal tandem gait without limping," and could "heel walk and toe walk normally." *Id.* Dr. Abram felt a "more aggressive nonsurgical program" was warranted, but did

not recommend surgery, finding that Tracey "need[ed] to attempt to improve further through

nonsurgical management" including non-narcotic pain medications, "good quality" physical

exercise, and "significant weight loss." *Id.* Tracey attended physical therapy from July to August

2016, which resulted in temporary improvement on most occasions. *See* R. 291, 343–48, 478–91.

     Tracey still experienced episodic back pain and on April 21, 2017, she sought emergency

care for "acute" back pain that began one week earlier. R. 427 ("She has a herniated disc

sustained at work from heavy lifting 1 year ago. At times, she will get pain and muscle

spasms."). She reported to Mark Cousineau, M.D., that her symptoms were exacerbated by

sitting or standing for long periods and that her pain had increased after she did more household

work than normal when looking after her nieces the previous weekend. *Id.* Straight leg raises of

both legs did not elicit lower back pain, but she had a painful range of motion in her back and

muscle spasms were observed in her right lower back. R. 428. Dr. Cousineau characterized

Tracey's pain as "mild" and observed that her "symptoms ha[d] markedly improved" in the

emergency room after receiving a Valium injection and Dilaudid. R. 428–29.  On April 27,

Tracey had a follow-up appointment with Dr. Abrams, who noted that Tracey "was last seen in

08/2016 and was expected to return but cancelled." R. 452. At that time, Dr. Abram observed

that she ambulated "slowly" and had full flexion with "mild" pain in her spine. R. 453.  He

diagnosed muscle strain and again recommended physical therapy and home exercises. *Id.*

     About a month later, Tracey sought emergency care for acute episodic lower back pain

on her right side. R. 430–34; *see* R. 430 ("The symptoms/episode began/occurred yesterday. . . .

The patient has experienced a previous episode, last year."). Exam findings were normal. R. 430-

31. A CT scan demonstrated "multilevel spondylotic change within the visualized spine" and

"facet arthropathy in the lower lumbar spine." R. 433. The attending physician noted that

Tracey's pain level was "moderate" at its worst, R. 430, prescribed a muscle relaxer, R. 432, and discharged her in stable condition, *id.*.

Tracey underwent a lumbar ESI in July 2017. *See* R. 447, 449. "She had some relief for about 3 days," but on the fourth day "she went to the E.R. with severe back pain and spasms." R. 447. The attending physician, Michael Ward, M.D., noted that Tracey was suffering another episode of "acute on chronic back pain with muscle spasms." R. 438 ("Problem is an acute exacerbation."); *see* R. 437 ("The patient has experienced similar episodes in the past, several times."). Dr. Ward observed painful range of motion and muscles spasms on examination, but otherwise normal signs. R. 437. He prescribed Mobic and a muscle relaxer and discharged her in stable condition. R. 438. On July 27, Tracey reported to Dr. Abram that her back pain "symptoms were relieved initially" after her recent ESI, "but the pain resumed after a few days" and that her "right leg pain [was] now resolved." R. 447. Dr. Abram recommended that Tracey continue to exercise and try to lose weight. R. 448 ("I advised her that weight loss will likely be of great benefit in reducing her symptoms."). He did not recommend physical therapy because Tracey had financial concerns. *Id.* At appointments in December 2017, Tracey complained of gradual-onset "shooting" back pain, R. 507, that radiated down her right leg, R. 509, which she characterized as "moderate to severe" and said was exacerbated by standing or walking, R. 509 ("The onset of the back pain has been gradual and has been occurring in a persistent pattern for weeks."); R. 509 (reporting gradual "moderate to severe" lower back pain with radiation "following a specific injury" exacerbated by "standing and walking") An examination on December 5 revealed a positive straight leg raise and decreased lumbar flexion and extension. R. 510. An examination on December 12 showed normal posture, normal strength and reflexes, negative straight leg raising tests, normal gait, and no need for assistive devices. R. 508.

In March 2018, Tracey had another MRI of her lumbar spine. R. 586–87. It revealed the

following findings at L4-L5:

> Subtle anterolisthesis now, [p]reviously seen left eccentric broad-based posterior disc extrusion has regressed. Residual mild broad-based disc bulge. Severe facet hypertrophy, capacious right facet joint and chronic facet joint fluid. Mild to moderate facet hypertrophy is stable except for a new small 5 mm synovial cyst on the right which contributes to mild to moderate right lateral recess stenosis. Mild spinal stenosis at this level has improved. Mild to moderate left greater than right L4 foraminal stenosis has also improved.

R. 587 (cleaned up). Radiologist Harold Hall, M.D.'s impression was as follows:

> 1. L4 L5 disc degeneration has regressed since 2016 but there is now subtle anterolisthesis at that level. Chronic severe facet arthropathy with a new small right side synovial cyst . . . contributing to mild to moderate right lateral recess stenosis. Still, regression of mild spinal and mild to moderate left greater than right foraminal stenosis at that level since 2016.
>
> 2. Stable to slightly progressed chronic disc degermation at L2-L3 and L3-L4 since 2016 with borderline to mild spinal stenosis at both levels.
>
> 3. Moderate facet degeneration at L5-S1 but no associated stenosis.

R. 587.

Reviewing these findings in May 2018, Benjamin Ditty, M.D., noted "mild to moderate

spondylosis," did "not identify anything that [he] expect[ed] to respond particularly well to

surgery," and referred Tracey for additional injection therapy. R. 597. Subsequent ESI again

provided some temporary relief. *See* R. 601, 605, 608.

Tracey reported issues with back pain in May 2019, R. 616, and was given a cane by

Joseph Stern, M.D., for her spondylolisthesis. R. 584. The order came after an appointment

wherein Tracey had complained to Dr. Stern of "lumbar and right lower extremity pain, stopping

shin level" and "recall[ed] injuring her back lifting pallets at work [in] April 2016." R. 616 (May

29, 2019). She reported that her physical therapy and injection therapy had not offered lasting

relief, "note[d] her right leg giving way when walking" recently, and "report[ed] increased back

pain since a long trip in January," but she "denie[d] any left leg pain numbness or tingling." *Id.*

9

Beyond her back issues, Tracey suffers from obesity, edema, and chronic venous insufficiency. *See* R. 367, 551, 572. Her edema and chronic venous insufficiency have been noted to cause swelling in her ankles. R. 551, 571–73. Typically, the swelling is reduced with treatment. *See* R. 551, 571–73.

     2.     *Tracey's Statements*

In August 2017, Tracey submitted a Function Report and Pain Questionnaire to DDS. *See* R. 194–204. Tracey explained that her back pain rendered routine tasks more difficult and made her less able to be on her feet for prolonged periods. R. 199, 204. Her pain specifically impacted her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs, and she was unable to lift more than fifteen pounds. R. 202. Additionally, she could not walk more than thirty minutes before needing a ten-minute rest. *Id.* Tracey lived with her daughter and husband, and she enjoyed reading, watching television, and attending church. R. 201. She went out to eat a couple of times a month, went to the gym about three times each week, and grocery shopped twice per week. R. 200–01. She usually could not cook full meals without help, could no longer go on long car rides, and could not climb stairs. R. 198–99. Tracey was able to sweep, mop, dust, fold and wash clothes, make the bed, and vacuum, although doing so sometimes required assistance. R. 199. Her back pain caused trouble sleeping. R. 197–98, 204.

Tracey later submitted a second, undated Function Report to DDS. *See* R. 227–34. Her pain was increasing and taking the joy out of life. R. 227–28. She still had trouble sleeping and needed help tying her shoes or bathing. R. 228. She was able to prepare simple meals, drive, and shop and continued to enjoy reading and watching television. R. 229–31. She could now lift only five pounds and walk about five or ten minutes before needing to rest for at least fifteen minutes.

R. 232. She required a cane to walk and her inability to stand, walk, or sit for any significant

length of time had brought on frustration, depression, and anger. R. 233.

In June 2019, Tracey testified before ALJ Johnson at an administrative hearing. R. 60–

75. She stated that while at work around April 2016, she "felt something pull in [her] back" as

she lifted a pallet and has been unable to work since. R. 60. On the day of the incident, Tracey's

pain level was a ten out of ten, but medications and injections provided some temporary relief. R.

62–63. She testified that her back pain limited her in her abilities to cook, clean the house, go out

with family, and walk long distances. R. 63. However, Tracey would "try to make [her] bed,"

and could sweep and do laundry for short intervals. R. 64. She could walk about 40–50 yards

before needing to rest, and she could sit for two to three hours with a pillow situated between her

legs but needed to stand up and stretch. *See* R. 65–66. She was unable to lift anything over ten

pounds and her medication was effective only some of the time, and sometimes caused nausea

and dizziness. R. 68–70.

*B.    The ALJ's Decision*

ALJ Johnson found that Tracey suffered from severe impairments of degenerative disc

disease of the lumbar spine and morbid obesity. R. 13; *see* R. 19. In finding her other alleged

impairments, including high blood pressure and chronic venous insufficiency, to be non-severe,

ALJ Johnson explained:

> The claimant also alleges high blood pressure, high cholesterol, sinus tachycardia,
> chronic venous insufficiency, depression and anxiety. The record indicates the
> claimant has been diagnosed with hypertension, high cholesterol, sinus tachycardia,
> and chronic venous insufficiency; however, while the claimant's blood pressure is
> elevated at times, the evidence demonstrates these conditions are generally well
> controlled with treatment. In addition, there is no history of stroke or evidence of
> end organ damage, cardiovascular disease, or functional limitations related to the
> claimant's hypertension or sinus tachycardia. Further, her cardiologist stated that
> the claimant was fine from a cardiac standpoint in January 2018, and an

echocardiogram in March 2019 showed normal diastolic functions. ABI testing has also been normal. The evidence does not show that the claimant's hypertension, high cholesterol, sinus tachycardia, and chronic venous insufficiency impose more than minimal restrictions on her ability to engage in work-related tasks. Therefore, the undersigned must find that they are not severe impairments.

R. 14 (cleaned up). He then assessed Tracey's alleged mental impairments and determined that "the evidence as a whole is not sufficient to establish that the claimant has a medically determinable mental impairment." *Id.* He noted that Tracey had not been diagnosed with, or treated for, a mental impairment and that mental status examination findings were normal. *Id.* Alternatively, he found that if she had medically determinable impairments of anxiety or depression, they caused no more than mild limitations in her abilities to understand, remember, or apply information; to interact with others; to persist or maintain pace; and to adapt or manage oneself. *Id.*

Turning to the RFC assessment, ALJ Johnson found that Tracey could perform "light" work with additional limitations, including needing the option to alter positions between sitting and standing at intervals of approximately thirty minutes while staying on task. R. 15. In crafting this RFC finding, he acknowledged Tracey's testimony that she could not work full time anymore because of "pain in her back that radiates into her legs, which began after a work injury in April 2016," that she could "sit two to three hours, stand one hour, and walk 30 to 50 yards at a time," and that postural activities like bending and kneeling exacerbated her pain. R. 16. He found that Tracey's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record," including the generally unremarkable findings on physical exams, the conservative and sporadic nature of her treatment, her reports of temporary improvement

with ESI, and her failure to heed her doctor's recommendation that she lose weight to manage her back pain. *Id.*

The ALJ then considered the opinions of DDS experts Dr. Spetzler and Dr. Bristow, both of whom concluded that Tracey could do the following: stand and walk about six hours and sit about six hours in an eight-hour workday; lift and carry twenty pounds occasionally and ten pounds frequently; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl. R. 20, 87–96, 99–109. Likewise, both physicians opined that Tracey must avoid even moderate exposure to vibrations and hazards. R. 20, 94, 106–07. ALJ Johnson found these opinions were "largely consistent with [the medical] evidence." R. 20. He noted that the limitations identified by these physicians were consistent with degenerative disc disease in conjunction with obesity and the fact that Tracey's own "providers generally fail to describe any abnormalities in her gait, or to note that she appears uncomfortable sitting or standing during appointments . . . suggests that she should be able to perform these activities as indicated by [the DDS experts] provided she is allowed to alternate positions approximately every 30 minutes" while remaining on task. *Id.*

C.    *Analysis*

1.    *Consideration & Characterization of Evidence Relating to Back Pain*

Tracey's arguments primarily focus on ALJ Johnson's alleged failure to consider certain evidence, and his alleged mischaracterization of evidence in the record. For instance, she argues that comparing her May 2016 and March 2018 MRIs "clearly shows that my condition overall, according to the medical objective evidence that is visible to us, . . . as it relates to my lumbar and cervical spine has worsened and in some instances, according to the MRI, regression has occurred." Pl.'s Br. 5 ¶ V. She also contends that ALJ Johnson undertook an impermissibly

selective view of the evidence, noting only the findings favoring a conclusion that she was not disabled. *Id.* at 5 ¶ VI.

"[T]he Commissioner's decision must 'contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.'" *Reid v. Comm'r Soc. Sec. Admin.*, 769 F.3d 861, 865 (4th Cir. 2014) (quoting 42 U.S.C. § 405(b)(1)). Further, "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of disability." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *see also Kemp v. Astrue*, Civ. No. 6:08-313, 2009 WL 580450, at *10 (D.S.C. Jan. 26, 2009) (recommending remand where ALJ improperly relied "on isolated snippets of evidence that support[ed] his ultimate conclusion without mentioning or reconciling the evidence that directly contradict[ed] his position"). Where the ALJ says he considered certain evidence, and the record does not contradict the ALJ's assertion, the Fourth Circuit instructs district courts to take the ALJ at his word. *Reid*, 769 F.3d at 865 ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word."). Where the ALJ "both identif[ies] evidence that supports his conclusion and build[s] an accurate and logical bridge from that evidence to his conclusion," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis omitted), it is not the province of a reviewing court to "weigh the evidence," *Boston v. Barnhart*, 332 F. Supp. 2d 879, 890 (D. Md. 2004), or to substitute its own judgment for that of the ALJ, *Davis v. Barnhart*, 392 F. Supp. 2d 747, 751 (W.D. Va. 2005) ("[T]he Fourth Circuit has . . . admonished that it is the role of the ALJ, and not reviewing courts, to resolve conflicts in evidence.").

First, Tracey appears to misunderstand how the term "regression" is used in the medical context. Although she points to findings of "regression" in the March 2018 MRI as evidence of her worsening condition, regression in this context is indicative of improvement, meaning the condition is not as serious as it had previously been. *See* R. 587. This understanding of the term "regression" is corroborated by Dr. Hall's impression of the MRI findings. For example, MRI findings from March 2018 noted, "[p]reviously-seen left eccentric broad-based posterior disc extrusion has regressed . . . . Mild spinal stenosis at this level has improved. Mild to moderate left greater than right L1 foraminal stenosis has also improved." R. 587. Nonetheless, Tracey's March 2018 MRI also demonstrated progression at certain levels. *See* R. 587, 597. For instance, although Dr. Hall noted that Tracey's "L4 L5 disc degeneration [had] regressed since 2016," he also observed that she "now [had] subtle anterolisthesis at that level." *Id.* Further, he noted "regression of mild spinal and mild to moderate left greater than right foraminal stenosis" since 2016 at L4-L5 and "[s]table to slightly progressed chronic disc degeneration at L2-3 and L3-L4 since 2016 with borderline to mild spinal stenosis at both levels." *Id.*

ALJ Johnson plainly considered the range of findings on Tracey's MRIs in his decision. *See* R. 18 (citing R. 586–87). In making his RFC finding, he observed that the March 2018 MRI "showed the L4-L5 disc degeneration had regressed since the previous imaging but that level had developed subtle anterolisthesis," and that it "showed chronic facet arthropathy with mild to moderate lateral recess stenosis and regressing foraminal stenosis, stable to slightly progressed chronic degeneration at L2-3 and L3-L4 and moderate facet degeneration at L5-S1 with no stenosis." *Id.* He also considered that "[b]ased on this, the claimant's neurosurgeon stated she

was not a candidate for surgery,[5] but she may benefit from additional epidural injections." *Id.*

The ALJ discussed the relevant findings from the MRI and considered their import. The fact that

he did not specifically list every finding of the March 2018 MRI does not render his

consideration of that evidence insufficient. *Reid*, 769 F.3d at 856 ("[T]here is no rigid

requirement that the ALJ specifically refer to every piece of evidence in his decision." (quoting

*Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005))). Further, taking the ALJ at his word,

he undertook a "careful consideration of the evidence," R. 16, and nothing in the record

contradicts his assertion. *See Reid*, 769 F.3d at 865.

Overall, the evidence demonstrates that Tracey has had symptoms and limitations from

ongoing back pain related to her degenerative disc disease since her workplace accident in April

2016. *See, e.g.*, R. 323, 430, 451, 507. On the other hand, evidence also shows improvement

since the accident. *See* R. 343–48, 478–91. For instance, while Tracey reported improvement

from physical therapy from July to August 2016, she sought emergency care for back pain in

April 2017. R. 427–29. And, although Tracey sought emergency care for back pain again in May

and July 2017, her symptoms were noted to be "moderate" during those visits. R. 430, 437.

Tracey has relatively consistently reported relief from epidural injections and physical therapy,

but such relief has only been temporary. R. 447–54. Nonetheless, after undergoing injection

therapy in July 2017, Tracey did not again seek care for her back pain until November 2017,

when she was referred to a pain management specialist. *See* R. 512–15. That December, she was

experiencing "moderate to severe" back pain, and her March 2018 MRI demonstrated some

progression. R. 509, 587, 597–98. Nevertheless, it appears she again had temporary relief from

---

[5] ALJ Johnson reasonably interpreted Dr. Ditty's observation that he was unable to "identify anything that
[he] expect[ed] to respond particularly well to surgery," R. 597, as indicating that Tracey's condition did
not make her "a candidate for surgery," R. 19.

injection therapy between May and October 2018. R. 599–601, 607, 610–11. The evidence also demonstrates that Tracey suffers from hypertension, chronic venous insufficiency, and edema, which have caused intermittent swelling in her legs; however, the record does not indicate these conditions impose any work-related functional limitations. *See* R. 549–51, 563–66, 571–76.

ALJ Johnson discussed the relevant evidence in his RFC analysis. In addition to considering Tracey's MRI findings, he considered her reports that she improved with physical therapy in the summer of 2016, R. 17, and that she "exhibited tenderness and painful range of motion in her back during physical therapy and primary care appointments" in May, June, and July of that year, R. 16. He also discussed Dr. Cousineau's report from Tracey's April 2017 emergency room visit and the absence of treatment from her orthopedic specialist from August 2016 to April 2017. R. 17. He noted the examination findings, assessments, and treatment prescribed during Tracey's May and July 2017 emergency room visits and her July 2017 follow-up appointment with Dr. Abram, her complaints of back pain in November 2017 and subsequent referral to a pain management specialist, and her examination findings from December 2017. R. 17–18. After discussing the March 2018 MRI, ALJ Johnson then considered Tracey's reported improvement from injection therapy in May, September, and October of 2018, and her renewed complaints of back pain in May 2019. *Id.*

ALJ Johnson's discussion shows that he adequately considered the evidence of record. His lengthy narrative, although not specifically listing each finding in the record, addresses all the relevant evidence in this case. Although some evidence shows that Tracey's condition was worse at certain times than others, this does not necessarily mean that she was disabled. *See Green v. Astrue*, No. 3:10cv764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011) ("An individual does not have to be pain-free in order to be found 'not disabled.'"), *adopted* 2011 WL

5599421 (E.D. Va. Nov. 17, 2011). Moreover, the ALJ discussed the differing reports of symptoms, exam findings, and other medical evidence, weighed that evidence, and identified the evidence he found most persuasive, as he was required to do. *Robinson v. Colvin*, No. 7:12cv272, 2014 WL 1276507, at *2 (W.D. Va. Mar. 27, 2014) ("Any conflicts in the evidence are to be resolved by the Commissioner (or his designate, the ALJ), not the courts, and it is immaterial whether the evidence will permit a conclusion inconsistent with that of the ALJ."); *see also Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.").

Furthermore, the record does not support Tracey's contention that ALJ Johnson used terms only supporting a finding of not disabled and "ignored" or "overlooked" terms suggesting greater severity. *See* Pl.'s Br. 5–6 ¶ VI. Although ALJ Johnson did not note every qualifying adjective in the medical findings, he did identify many of them, *see* R. 17–19, and his discussion of the evidence provided a reasonably balanced picture of the medical and other evidence. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) ("The ALJ must evaluate the record fairly."). His more frequent use of the terms "mild" and "moderate," and lesser use of the term "severe," correlates to the frequency with which those terms appear in the medical record. Tracey's physicians simply referred to "mild" or "moderate" abnormal findings more often than they identified any as severe. ALJ Johnson "both identif[ies] evidence that supports his conclusion and build[s] an accurate and logical bridge from that evidence to his conclusion" *Woods*, 888 F.3d at 694 (cleaned up), and he accurately characterizes the evidence within his decision. Thus, I find that ALJ Johnson sufficiently considered the evidence.

    2.    *Credibility Determinations & RFC Finding*

Tracey additionally takes issue with ALJ Johnson's discounting of her symptoms and alleged limitations, as well as his determination of her RFC. She asserts that her condition is "a lot worse than the social security administration wants to acknowledge," Pl.'s Br. 6 ¶ VI, and "the medical evidence and testimony highlighted [in the record] supports a finding that the duration, intensity, persistence, and limiting effects of the[] symptoms" reported were consistent and rendered her disabled. *Id.* at 7 ¶ VII.

The regulations set out a two-step process for evaluating a claimant's alleged symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant." *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Step One is a "threshold" inquiry, at which the "'intensity, persistence, or functionally limiting effects' of the claimant's asserted pain" are not considered. *Id.* Assuming the claimant clears the first step of the *Craig* analysis, the ALJ moves on to Step Two. There, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015); *Hines*, 453 F.3d at 565; *see also* SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016). "The second determination requires the ALJ to assess the credibility of [subjective] statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, after considering all the relevant evidence in the record, 20 C.F.R. § 404.1529(c). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). A reviewing court will uphold the ALJ's

credibility determination if his articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)).

Tracey's argument appears to challenge the ALJ's finding that Tracey's "statements concerning the intensity, persistence, and limiting effects of" her lower back pain and obesity "are not entirely consistent with the medical evidence and other evidence in the record," R. 16. *See, e.g.*, Pl.'s Br. 2 ¶ 1 ("[F]or the past five (5) to six (6) years, I have been experiencing severe, chronic and constant pain in my lower lumbar region of my lumbar spine that radiates down both of my legs[.]"); *id.* at 7 ¶ VIII ("[T]he medical evidence and testimony highlighted in my . . . Record[] supports a finding that the duration, intensity, persistence, and limiting effects of [my] symptoms are consistent in supporting a finding that I am disable[d]."). I cannot agree.

ALJ Johnson provided ample support for his discounting of Tracey's allegedly disabling symptoms and limitations, including both objective and subjective considerations. *See* R. 19. He twice acknowledged that Tracey "stated her symptoms prevent her from working because she cannot sit, stand, or walk for very long before she must change positions, she needs a cane to walk, she can only lift 10 pounds, she has problems maintaining concentration, and she struggles to complete even routine daily tasks at times." *Id.*; *see also* R. 16. The ALJ discussed the objective medical evidence that supported some degree of limitation, noting that "[p]hysical examinations . . . [did] sometimes reveal tenderness and a limited range of motion" and she occasionally "displays positive straight leg raise tests and edema in her lower extremities, and, on one occasion, she was noted to have right EHL weakness." R. 19. But he observed, "[o]ther than this, examinations are generally unremarkable, with [Tracey] displaying normal range of motion in all other areas, full strength, and intact sensation." *Id.* Lastly, the ALJ noted that

although Tracey was prescribed a cane, aside from one instance where she was noted to have

ambulated slowly, "providers have not described abnormalities in her gait and station or

observed her using an assistive ambulatory device."[6] *Id.*

ALJ Johnson also noted that Tracey's treatment had been sporadic and "quite

conservative," her pain temporarily improved with physical therapy and injection therapy, she

generally did not heed her doctor's repeated advice that weight loss would reduce her pain, she

did not require surgery for her back pain, and when she sought emergency care, she was

"discharged the same day in stable condition," R. 19. *See Dunn v. Colvin*, 607 F. App'x 264, 273

(4th Cir. 2015) ("[T]his Court has long held that it is appropriate for the ALJ to consider the

conservative nature of a [claimant's] treatment—among other factors—in in judging the

credibility" of her complaints); *Mabe v. Colvin*, No. 4:12cv52, 2013 WL 6044239, at *7 (W.D.

Va. Nov. 15, 2013) ("[T]here is substantial evidence to support the ALJ's finding that Plaintiff's

gaps in treatment and failure to obtain therapy render his complaints less than credible.").

---

[6] "Social Security Ruling 96-9p requires an ALJ to consider the impact of medically required hand-held devices, such as a cane or walker, when evaluating the claimant's RFC." *Candi L. v. Comm'r of Soc. Sec.*, No. 4:17cv30, 2018 WL 7690318, at *8 (W.D. Va. July 31, 2018) (internal quotation marks omitted), *adopted sub nom. Lumpkin v. Comm'r of Soc. Sec.*, 2019 WL 1264890, at *3–5 (W.D. Va. Mar. 19, 2019), *and aff'd*, 808 F. App'x 210, 211 (4th Cir. 2020); *see* SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996). "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing and describing the circumstances for which it is needed." SSR 96-9p, 1996 WL 374185, at *7. "The claimant bears the burden to show that her use of a particular hand-held assistive device to perform work-related functions is in fact medically necessary and therefore should have been included in the RFC finding." *Candi L.*, 2018 WL 7690318, at *8. Here, although Tracey was prescribed a cane, R. 584, ALJ Johnson accurately observed that "except for one time when she was noted to be ambulating slowly, providers have not described abnormalities in her gait and station or observed her using an assistive ambulatory device," R. 19. Further, Tracey points to no "documentation establishing the need for a hand-held assistive device to aid in walking or standing and describing the circumstances for which it is needed," nor is any apparent from the record. SSR 96-9p, 1996 WL 374185, at *7. As such, Tracey has not established that her cane was "medically required," and ALJ Johnson was not required to consider its impact when determining her RFC. *See Candi L.*, 2018 WL 7690318, at *8. Considering the lack of evidence showing that Tracey needed a cane, ALJ Johnson adequately explained why he did not account for the use of an assistive ambulatory device in the RFC.

Additionally, ALJ Johnson observed that Tracey's activities of daily living included being "able to prepare simple meals, do some household chores, drive, attend church, and go shopping," and going "on a long trip in January 2019," R. 19. *See Mastro v. Apfel*, 270 F.3d 171, 179–80 (4th Cir. 2001) ("We find that the ALJ correctly applied the law in concluding that [the claimant's] reported daily activities undermined her subjective complaints of [pain]."). The ALJ could reasonably find that this sort of conservative treatment and her report of modest activities were inconsistent with Tracey's report of disabling symptoms and limitations. Thus, ALJ Johnson offered sufficient reasons for concluding that Tracey's symptoms were less severe than alleged. *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020).

Tracey also argues that ALJ Johnson incorrectly concluded that she maintained the RFC to perform light work with additional limitations. *See* Pl.'s Br. 6–7. Social Security Ruling 96-8p "instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis including the functions' listed in the regulations." *Mascio*, 780 F.3d at 636 (quoting SSR 96-8p). Further, the "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* "Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (quoting SSR 96-8p).

In assessing Tracey's RFC, the ALJ discussed the exam findings, the treatment prescribed by Tracey's physicians, her reported symptoms and daily activities, and any functional limitations either reported by Tracey or observed by her physicians. *See* R. 15–21.

Moreover, ALJ Johnson fashioned Tracey's RFC to adequately account for the functional limitations supported by the record. *See generally* R. 15–21. He accounted for Tracey's credible back limitations by restricting her to "light" work with the option to change positions between sitting and standing at intervals of approximately thirty minutes while staying on task. R. 15; *see* R. 65 ("I can sit for, like, two to three hours, but . . . I get up, you know, and stretch and bend."). He also found she had postural and environmental limitations, including that she could never climb ladders, ropes, or scaffolds, only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and must limit her exposure to workplace hazards. *Id.*

Although some evidence in the record could support greater limitations, the ALJ's RFC determination is amply supported by relevant evidence in the record. For example, evidence showing mild MRI findings, periods of improvement, R. 291, 347, 428, 438, cancelled scheduled appointments, R. 452, generally normal exam findings, including full range of motion, full strength, normal gait, and ambulating without assistance, R. 336–39, 427–29, 437–39, and many of her reported daily activities offer support for ALJ Johnson's RFC finding, R. 197–204, 227–34, 60–75. Because this evidence "allows reasonable minds to differ as to whether [the] claimant is disabled," I must find that substantial evidence supports the RFC determination. *Johnson*, 434 F.3d at 653.

3.    *Consideration & Severity of Other Impairments*

Tracey also argues that the ALJ did not consider many of her impairments and erroneously found them non-severe at Step Two of the five-step sequential analysis. Pl.'s Br. 6 ¶ VII. She asserts that her obesity, chronic venous insufficiency, edema, and "lumbosacral spondylosis with acute lumbar radiculopathy and acquired spondylolisthesis of the lumber region

of [the] spine" were not considered. *Id.* She also contends that the ALJ downplayed the severity

of these conditions. *Id.* Her arguments are without merit.

It is well settled that the ALJ must consider the combined effect of a claimant's

impairments when determining a claimant's ability to work, and "adequately explain his or her

evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th

Cir. 1989). Further, "when determining a claimant's RFC, the regulation requires the ALJ to

'consider the limiting effects of all the claimant's impairments, even those that are not severe.'"

*Price v. Astrue*, No. 5:08cv485, 2009 WL 2568194, at *3 (E.D.N.C. Aug. 17, 2009) (quoting 20

C.F.R. § 404.1545(e)) (cleaned up). Lastly, where a claimant is obese, the ALJ "must consider

the cumulative effect of obesity and any other impairments" in assessing her RFC. *Waller v.*

*Colvin*, No. 6:12cv63, 2014 WL 1208048, at *6 (W.D. Va. Mar. 24, 2014).

Here, ALJ Johnson adequately considered Tracey's alleged impairments and their

combined effects. First, contrary to Tracey's assertion, the ALJ did find that her obesity

constituted a severe impairment. R. 13. He found that her morbid "obesity exacerbates her other

impairments[] and plays a role in her physical limitations." R. 19. Additionally, when assessing

the DDS opinions, both of which considered Tracey's obesity, R. 94, 104, the ALJ found them

"largely consistent with [the medical] evidence," R. 20, and noted that Tracey's severe

degenerative disc disease with radiculopathy, "particularly when considered in conjunction with

her obesity, limits her exertional capacity," *id*. Thus, ALJ Johnson plainly considered not only

the limiting effects of Tracey's "severe" obesity on its own, but also the limiting effects of that

impairment in conjunction with her other physical impairments and related symptoms. *See*

*Fluellen v. Colvin*, No. 4:14cv30, 2015 WL 2238997, at *3 (W.D. Va. May 12, 2015). As such, I

cannot find that ALJ Johnson failed to adequately consider Tracey's obesity. *Greenway v.*

*Astrue*, No. 6:12cv5, 2013 WL 4929931, at *7 (W.D. Va. Sept. 12, 2013) ("[A]n explicit and in-depth analysis of obesity is not required. All the regulations require is that the ALJ consider the combined effects of obesity with other impairments and consider the effects of obesity in the final four steps of the sequential disability evaluation." (citation omitted)); *see also id.* ("[C]ourts have found that relying on medical records which adequately show a claimant's obesity and adopting the conclusions of the doctors who were aware of that obesity is adequate.").

ALJ Johnson also adequately considered Tracey's remaining impairments. Her physician suggested that her chronic venous insufficiency and edema are somewhat overlapping and cause swelling in her legs and ankles. *See* R. 551, 571–73. At step two, ALJ Johnson discussed Tracey's chronic venous insufficiency, finding it to be non-severe as the evidence showed the condition was "generally well controlled with treatment" and did "not impose more than minimal restrictions on her ability to engage in work-related tasks." R. 14. Tracey's chronic venous insufficiency was mentioned one time in the record, no related exam findings or limitations were noted, and her doctor recommended further study of the condition. *See* R. 572. The ALJ discussed Tracey's edema, or swelling of the lower extremities, in the context of the severity of her symptoms. *See* R. 19. He noted that Tracey occasionally had "edema in her lower extremities, and, on one occasion, she was noted to have right EHL weakness," but otherwise her examinations were "generally unremarkable with the claimant displaying a normal range of motion in all other areas, full strength, and intact sensation." *Id.* The ALJ accurately noted that Tracey's medical providers occasionally found edema. Indeed, the few times edema is mentioned, the record shows some leg or ankle swelling that was treated with a diuretic. R. 551, 571. Considering this record and the ALJ's discussion, it is clear that he considered the limited evidence of Tracey's chronic venous insufficiency and her edema and that he reasonably

determined they did not cause any limitations beyond those he identified in the RFC. *See Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011); *McAnally v. Astrue*, 241 F. App'x 515, 518 (10th Cir. 2007) (affirming denial of benefits where plaintiff did "not identify any functional limitations that should have been included in the RFC [finding] or discuss any evidence that would support the inclusion of any limitations").

Moreover, and for the same reasons, ALJ Johnson's conclusion that these impairments were non-severe is supported by substantial evidence. *See* 20 C.F.R. § 404.1522 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). The same is true for Tracey's other non-severe impairments, including her high blood pressure, high cholesterol, and sinus tachycardia. The record shows that each of these conditions was diagnosed, but no evidence suggests that Tracey has any functional limitations associated with them. *See Felton-Miller*, 459 F. App'x 229–30 ("[M]edical conditions alone do not entitle a claimant to disability benefits; '[t]here must be a showing of related functional loss.' Accordingly, [the claimant's] sarcoidosis diagnosis, without more, does not establish that she suffers from any particular symptoms or limitations." (quoting *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986)). Additionally, the record does not show that Tracey was diagnosed with, or treated for, depression and anxiety. Thus, the ALJ properly found them to be not medically determinable impairments.

Lastly, Tracey argues that the ALJ did not adequately consider her back condition, again pointing to the specific words ALJ Johnson used, or did not use, to describe that medical impairment. *See* Pl.'s Br. Although the ALJ did not use the term "lumbosacral spondylosis with acute right lumbar radiculopathy and acquired spondylolisthesis of the lumbar region of [the] spine," the ALJ adequately discussed the evidence of Tracey's lumbar spine condition. The word

"spondylosis" is simply one way of describing degenerative disc disease. *Lumbar Spondylosis*, Univ. of Mich. Health (last updated Nov. 16, 2020), https://www.uofmhealth.org/health-library/abr8401 ("Spondylosis is age-related change of the bones (vertebrae) and discs of the spine. These changes are often called degenerative disc disease and osteoarthritis."). Spondylolisthesis is where a "vertebra slips out of place onto the vertebra below" and may be caused by degenerative disc disease. *See Spondylolisthesis*, Cleveland Clinic (last updated Aug. 20, 2020), https://my.clevelandclinic.org/health/diseases/10302-spondylolisthesis. Both conditions thus relate to Tracey's degenerative disc disease and the condition of her lumbar spine, *see* 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.00A, 1.04, which the ALJ considered at length within the decision, *see generally* R. 15–20.

    *4.    ALJ Bias*

    Finally, Tracey argues that the ALJ did not act "fairly, impartially and objectively" when evaluating the medical evidence. Pl.'s Br. 6 ¶ VI. Other than her conclusory allegation that, "[i]f they had, they would have found me disable[d]," she does not point to any specific evidence in the record suggesting bias by the ALJ.

    "[T]he constitutional requirement of due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities." *Thornton v. Barnhart*, No. 5:05cv55, 2006 WL 759672, at *10 (W.D. Va. Mar. 21, 2006) (citing *Schweiker v. McClure*, 456 U.S. 188, 195 (1982)). In evaluating a claim that an ALJ was biased against the claimant, "this court must begin with the 'presumption that policymakers with decisionmaking power exercise their power with honesty and integrity.'" *Collier v. Comm'r of Soc. Sec.*, 108 F. App'x 358, 363 (6th Cir. 2004) (cleaned up) (quoting *Navistar Int'l Tranps. Corp. v. U.S. Envtl. Agency*, 941 F.2d 1339, 1360 (6th Cir. 1991)). To overcome this presumption, the claimant bears the burden of

presenting "convincing evidence that a risk of actual bias or prejudgment is present." *Id.* at 364

(cleaned up). She must "demonstrate either some conflict of interest or other specific reason for

disqualification." *Thornton*, 2006 WL 759672, at *10.

Tracey has not met her burden here. The record is entirely devoid of any indication that

ALJ Johnson had a conflict of interest affecting his ability to fairly evaluate Tracey's claim.

Likewise, Tracey points to no specific action by ALJ Johnson demonstrating that his conclusion

resulted from a bias against Tracey, rather than an impartial evaluation of the record as a whole.

Tracey's mere disagreement with ALJ Johnson's analysis of the evidence does not constitute

bias. Thus, I reject Tracey's final argument.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge

**GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 19, and **AFFIRM** the

Commissioner's final decision.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and
> Recommendation], any party may serve and file written objections to such
> proposed findings and recommendations as provided by rules of court. A judge of
> the court shall make a de novo determination of those portions of the report or
> specified proposed findings or recommendations to which objection is made. A
> judge of the court may accept, reject, or modify, in whole or in part, the findings
> or recommendations made by the magistrate judge. The judge may also receive further
> evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: December 23, 2021

Joel C. Hoppe
U.S. Magistrate Judge